# IN THE COURT OF APPEALS OF IOWA

No. 23-0540
Filed September 4, 2024

IN RE THE MARRIAGE OF ELENA MAE BELL
AND BARRETT ANDREW BELL

Upon the Petition of
ELENA MAE BELL,
       Petitioner-Appellee/Cross-Appellant,

And Concerning
BARRETT ANDREW BELL,
       Respondent-Appellant/Cross-Appellee.
_____

Appeal from the Iowa District Court for Dubuque County, Monica Zrinyi

Ackley, Judge.

Both parties appeal the property-division provisions of the decree dissolving

their marriage. **AFFIRMED AS MODIFIED ON APPEAL; AFFIRMED ON**

**CROSS-APPEAL.**

Jamie A. Splinter of Splinter Law Office, Dubuque, for appellant/cross-

appellee.

Andrew B. Howie and Jonathon P. Tarpey of Shindler, Anderson, Goplerud

& Weese, P.C., West Des Moines, for appellee/cross-appellant.

Considered by Schumacher, P.J., Langholz, J., and Bower, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**LANGHOLZ, Judge.**

Elena Bell petitioned to dissolve her three-year marriage with Barrett Bell in January 2022. And after a dissolution trial—in which Barrett had an attorney and Elena represented herself—the district court issued a decree dissolving their marriage in February 2023. Both parties appeal, challenging the property division in their dissolution decree. Barrett also argues that the district court failed to act as an impartial trier of fact. And both request an award of appellate attorney fees.

But Barrett did not preserve error on his challenge to the district court's impartiality. So we cannot consider it. And on our de novo review of the property division, we agree that the district court's division was equitable. But to avoid any potential confusion, we modify the decree to clarify that Barrett's $19,772 payment to Elena is the full extent of his responsibility for her debts and any remaining balance on the Discover credit card remains assigned to Elena—not Barrett. We thus affirm the decree as modified. And we decline to award either party appellate attorney fees.

## I.      Background Facts and Proceedings

Elena and Barrett married in December 2018 in Wisconsin before moving to Dubuque in June 2019. They were both in their fifties—and Barrett was about five years older than Elena. The parties had no children together.

During the marriage, Barrett worked at a Bible college, a public high school, and a grocery store. Barrett initially worked as a teacher at the college until he lost his job in August 2020. He collected unemployment through the CARES Act and worked sporadically at the grocery store until he started at the high school in August the next year. He had an estimated annual gross income of $36,000 to

$44,000 during the marriage, including funds he received from the CARES Act during the COVID-19 pandemic and his Oklahoma state pension.

Elena worked at the same Bible college as Barrett and another public school, and earned about $40,000 per year from wage income, as well as some other income from eBay sales, tutoring, and semi-pro backgammon tournaments. She worked at the college until her employer "found out [she] filed for divorce." She then accepted the position teaching in the public school.

The parties largely kept separate finances with each holding separate bank accounts, revolving credit lines, and auto loans. Barrett characterizes himself as a more conservative budgeter and Elena testified that he is frugal and does not like to carry personal debt. So many marital expenses have been charged to Elena's personal lines of credit. Elena had some credit card debt coming into the marriage, but it has ballooned since then. Neither party provided extensive histories of the changing credit balances during the marriage, but both agree that the credit card debt got out of hand during the marriage.

The parties' only major marital asset was a residence, which they sold in June 2021. After satisfying the mortgage and a purported loan to Barrett's parents, the parties evenly split the remaining $30,000 proceeds. Following that sale, the parties were transient, resided in various hotels, and primarily lived on credit. In June 2022, Barrett bought a new home in the name of the Barrett Bell Trust—the purchase price being 100% mortgaged. The new home is not a marital asset. The parties each individually hold a variety of pre-marital retirement accounts.

Both parties testified that the other has issues with various vices. Elena testified that Barrett had problems with excessive drinking throughout the

marriage. And this problem eventually led to the approval of a petition for a mental-health civil commitment in June 2021, which was later dismissed. Elena testified that the petition was dismissed because Barrett asked her not to participate in the proceedings and promised to seek treatment independently. According to Elena, Barrett also sought help for his drinking from his parents in Oklahoma during the period the parties were living out of hotels. And he has previously been arrested for public intoxication. Barrett and Elena both testified that Elena has spent significant sums of money gambling at casinos. How much of that spending resulted in debts still owed at the time of trial is unclear and was the subject of significant dispute during trial. But at least $3600 is reflected in the credit card statements submitted as exhibits. The full extent to which these vices financially impacted the marriage is disputed. Still, there is little doubt both parties played a part in the path to divorce.

Elena petitioned to dissolve their marriage without help from an attorney in January 2022. Trial was held a year later in February 2023. By then, the parties had lived separately about eight months. The only disputed issue was the division of the parties' assets and debts. The court issued the dissolution decree four days later. And a few weeks after that, in response to a 1.904 motion by Barrett, the court clarified the decree. Among the changes, the court struck a two-page itemization and assignment of the parties' assets and debts that it inadvertently included at the end of the decree, which the court stated, "was not used by the Court in rendering its decision" given that their marriage "was too short of a marriage to do a balancing and the Court awarded each of the parties their pre-marital and their individual assets." Barrett now appeals and Elena cross-appeals.

## II.     Error Preservation on the District Court's Impartiality

Barrett first argues that the district court engaged in judicial misconduct by failing to act as an impartial trier of fact and failing to hear evidence before making its decision.  And so, he asks us not to give the district court's factual findings any deference in our de novo review of the decree.  *See Miller v. Miller*, 202 N.W.2d 105, 108–09 (Iowa 1972) (providing that remedy for district judge's misconduct in talking to a recused judge about the case—when that issue had been presented to and rejected by the district court).  Elena counters that Barrett has not preserved error because he failed to raise the issue of impartiality in any way before filing this appeal.  We agree with Elena that the issue is not preserved for our review.

"To preserve an issue for appellate review, it must be raised and then decided at the trial level."  *In re Marriage of Heiar*, 954 N.W.2d 464, 469–70 (Iowa Ct. App. 2020); *see also In re Marriage of Ricklefs*, 726 N.W.2d 359, 362–63 (Iowa 2007) (refusing to address merits of challenge to district court's impartiality when error was not properly preserved).  This error-preservation requirement gives the district court an opportunity to fix the error itself "at a time when corrective action can be taken."  *Heiar*, 954 N.W.2d at 470 (cleaned up).  And it prevents "sandbagging—that is, it does not allow a party to choose to remain silent in the trial court in the face of error, take a chance on a favorable outcome, and subsequently assert error on appeal if the outcome in the trial court is unfavorable." *State v. Crawford*, 972 N.W.2d 189, 199 (Iowa 2022) (cleaned up).

Barrett contends that an email sent by the district court to the parties attempting to identify the factual issues to be litigated at trial was, in reality, the court engaging in judicial misconduct by telegraphing a future ruling for Elena.  He

also contends that it was inappropriate for the district court to provide Elena—a self-represented litigant—with the proper forms to complete before trial, and that the court provided more leniency in the rules of evidence to Elena than it did to his attorney during the trial.

But Barrett never raised the issue of the court's impartiality in the district court. He lodged only two objections during trial—one to the introduction of a piece of testimony on the ground of relevance, and one to the introduction of new exhibits after trial. Yet Barrett is not appealing these evidentiary rulings—he is arguing judicial misconduct occurred because of partiality by the district court. He never asked the judge to recuse in a written or oral motion. And his 1.904(2) motion contained no request to reconsider, enlarge, or amend because of the court's alleged partiality when ruling.

Barrett concedes that "he did not specifically" challenge the judge's impartiality in the district court. But he contends his arguments to the court about what evidence was properly considered should be good enough to raise the issue. We see nothing in Barrett's arguments to the district court that would have alerted it that he was challenging the judge's impartiality so that corrective action could have been taken. And the district court never decided and rejected a claim of partiality. So Barrett has not preserved the issue for appellate review.

### III. Property Division

We review a district court's division of property in a dissolution decree de novo. *See In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). Yet we are mindful of the district court's preferred fact-finding position and will only disturb a decree when it fails to do equity. *See id.* at 703.

In a dissolution decree, "[t]he court shall divide all property, except inherited property or gifts received or expected by one party, equitably between the parties." Iowa Code § 598.21(5) (2022); *see also In re Marriage of McDermott*, 827 N.W.2d 671, 678 (Iowa 2013) ("Iowa is an equitable distribution state."). Dividing property equitably requires considering the facts of each case and the factors in Iowa Code section 598.21(5). *See McDermott*, 827 N.W.2d at 682. While an equal division is often equitable, "the division need not be equal in most short-term marriages. Rather, it is often equitable to simply award the property to the party that brought it into the marriage." *In re Marriage of Hansen*, 886 N.W.2d 868, 873 (Iowa Ct. App. 2016); *see also* Iowa Code § 598.21(5)(a), (b) (requiring consideration of "[t]he length of the marriage" and "[t]he property brought to the marriage by each party").

Consistent with these principles, the district court "awarded each of the parties their pre-marital and their individual assets" because this was more equitable than an equal balancing given the short duration of the marriage. This approach was particularly appropriate because the parties also mainly kept their finances separate. The exceptions, according to the court's review of the evidence, were that the parties used many of Elena's credit cards for their marital living expenses—especially after they sold their house—and Barrett established a Dupaco Community Credit Union account during the marriage with marital funds. And so, the court found that while Elena would retain her debts and Barrett the Dupaco account, it was equitable for Barrett to pay Elena $19,772 to somewhat lessen the disparity of the division.

Barrett takes a shotgun approach to challenging the property division. But many of his challenges are aimed at the wrong target. He argues that the district court erred in including some of his premarital property in the marital assets—his Wisconsin retirement account ("WI WETF") and the property at 2410 Coates Street. Barrett appears to largely base his theory on the figures found in a balance sheet initially located on the last page of the decree. But in its ruling on Barrett's 1.904 motion, the court struck that balance sheet from the ruling, explaining that it was included in the ruling by mistake: "The final decision was not based on the balance sheet. . . . it is not referenced in the decree, was not used by the Court in rendering its decision and it is not relevant." And Barrett is requesting relief from several district court rulings that were in his favor—all of the assets that Barrett asks this court to award him were already granted to him by the district court— "[Barrett] is awarded his . . . WI WETF" and "[Barrett] is hereby awarded the home on Coates Street."

Barrett also argues we should correct the balance sheet to reflect the order's equal division of the medical debts and Barrett's Navy Federal Credit Union debt. But again, we need not address the balance sheet because the district court struck it from the ruling. And Barrett contends the district court should not have included "written off" debts in the marital debts. Yet this argument seems to be based on a misunderstanding of the concept of writing off debt. Writing off debt is a corporate accounting procedure by the lender. When a lender writes off debt, it has not forgiven the debt. The lender is merely recognizing that the account is delinquent and reports the debt as a loss on its financial statements—which has no effect on the debtor's obligation to pay the debt. No evidence was presented

suggesting that any "written off" debt was forgiven. So this claim of error also lacks merit.

Turning to his arguments more on point, Barrett contends that he should not have been ordered to pay Elena $19,772 and that instead she should pay him roughly $10,000, or at least there should be no payment by either party. He argues the court reached this wrong result because neither his $18,000 Dupaco account nor Elena's credit card debts should have been considered marital assets or debts. But neither argument holds up.

Barrett held $18,000 in a Dupaco account created following his receipt of a check from his parents for $24,000. Outside the parties' testimony, there is no evidence of the purpose for this payment. Barrett claimed that this payment was a gift from his parents of Walmart stock—paid in cash as an "early inheritance" rather than in stock. But Elena contested this claim and Barrett admitted that his parents have loaned him large sums of money at many points in his life. Barrett testified that he owed his parents as much as $40,000 at one point. Elena testified that Barrett refused to provide evidence of the other large transfers. And the record shows that both parties provided limited financial information in the form of exhibits. So the district court was forced to primarily use the parties' testimony to form a clearer picture of their financial situation, especially in the case of the Dupaco account. Giving the district court's first-hand assessment of the testimony deference, we decline to disturb the court's finding that this account was marital property.

As for Elena's credit-card debts, Barrett argues they should not have been included in the marital property to calculate his payment because Elena did not

provide credit card statements to reveal what percentage of the Discover credit-card debt is due to cash advances for gambling and that such gambling amounted to marital dissipation. "In determining whether dissipation has occurred, courts must decide '(1) whether the alleged purpose of the expenditure is supported by the evidence, and if so, (2) whether that purpose amounts to dissipation under the circumstances.'" *In re Marriage of Fennelly*, 737 N.W.2d 97, 104 (Iowa 2007) (citation omitted).

True, Elena's Barclays credit-card statements reveal she charged significant sums in cash advances to that card to fund gambling outings—over the $3600 accounted for in the statements provided. And the Diamond Jo Casino records reveal that Elena lost over $60,000 from gambling over the course of the marriage. But Elena testified that the Discover credit-card debt is largely from when she and Barrett were briefly living out of hotels after selling their home, and that during the marriage, she paid nearly all their collective expenses with the Discover card. She explained:

> [Barrett] is very frugal. He's got money. He's very frugal. We both admit that. He doesn't pull out his credit card for anything. He lives debt free. So any entertainment, any fun we did, any dinners we went out to, and we went on vacation one time . . . where he said that he didn't have any money. This was after he had bought a camper, but he couldn't afford the gas. He couldn't. I paid for everything. I said, Barrett, I want to go on vacation. I'll pay for the gas. I'll pay for the cost of the campsite. I'll pay for all of the food.

Elena also claimed that all of their basement remodeling was paid for with the Discover card. In response, Barrett claimed that his CARES Act payments in excess of $11,000 may have been "spent on the house and things," which presumably included remodeling, but that he could not remember what he spent

that money on. But when Elena clarified that the basement remodeling was completed over six months before Barrett received any CARES Act money, he admitted that money could not have been spent on the remodeling.

Like other topics of dispute, the parties did not provide the court an extensive history of Discover card statements, making it impossible to verify exactly which expenses should be allocated to the parties as marital assets or how much, if any, of that debt could be attributed to Elena's gambling. And the district court held that Elena is responsible for the debt on account for which statements showing gambling charges were submitted to the court. The only thing clear from Elena and Barrett's back-and-forth testimony about the main debt—the Discover credit-card account—is that there was frequent comingling of joint and individual expenditures. We cannot conclude from the evidence provided that Elena engaged in marital dissipation in regard to the credit-card debts included by the court or that it was improper to include them in the marital debts.

Based on these findings that the Dupaco account and much of the credit-card debt were marital assets and debt, it was equitable for the court to hold Barrett responsible for a portion of the debt and to give Elena a portion of the assets by ordering the payment of $19,772. As the court reasoned, "The figure was arrived at by an analysis of the manner of living of the parties, including their habits and vices, and their debt accumulation, which all fell on [Elena] as they travelled, lived and incurred obligations on [Elena's] credit cards." The Dupaco account and credit-card debt nearly cancel each other out, with neither party coming out far ahead of the other. We thus affirm the order for Barrett to pay Elena $19,772.

Still, we modify the language of the decree in one respect. While it does not seem to be the district court's intent, one could interpret the decree and the 1.904 ruling to assign the Discover credit-card debt to Barrett separately from his $19,772 cash payment obligation to Elana and not to require Elena to use the payment to pay off the credit-card debt.[1] Such a result would impose a double obligation on Barrett, which would be inequitable. Because we have affirmed Barrett's payment obligation, we thus modify the decree to clarify that the Discover credit-card balance remains the obligation of Elena. While she would be wise to use the cash payment from Barrett to pay down her debt, she need not do so. But if she does not, that decision will not affect Barrett.

On her cross-appeal, Elena argues the district court erred in awarding the $18,000 Dupaco account to Barrett rather than splitting it equally because the court found it is marital property. While her argument might have appeal in isolation, it overlooks the full context of the property division. True, the court did not award Elena $9000 from that specific account. But it ordered Barrett to pay more than twice that amount—$19,772—in a cash payment to equitably divide the parties marital assets and debts, including the Dupaco account. Increasing the award to Elena by another $9000 would be inequitable. And to the extent that she is just arguing that she should have been awarded some portion of the account directly

---

[1] In the original decree, the court ordered that Barrett "is responsible for . . . the Discover Credit Card balance." The decree also required that Barrett pay his judgment of $20,000 (later modified to the $19,772 referred to in this opinion) within sixty days and that "[o]nce received, [Elena] shall pay the Discover Credit Card balance." But then in its 1.904 ruling, the district court said, "Now that the parties are divorced, the award of cash to [Elena] is hers to use or hers to save. It is of no concern to [Barrett]."

in place of the cash payment, we cannot say equity requires that change. Indeed, we see little distinction between the district court's award and that alternative. We thus affirm on Elena's cross-appeal too.

## IV.    Appellate Attorney Fees

Both parties request we award them appellate attorney fees. Appellate attorney fees are awarded at our discretion and are not a matter of right. *See In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). When determining whether to award appellate attorney fees, we consider the needs of the party seeking the award, the ability of the other party to pay the fees, and the relative merits of the appeal. *McDermott*, 827 N.W.2d at 687. Considering those factors, we decline to award either party appellate attorney fees. Appellate costs shall be split equally.

**AFFIRMED AS MODIFIED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**